RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 13a0172p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT
_____

JOHN DAVID STUMPF,

        *Petitioner-Appellant,*

        *v.*

NORM ROBINSON, Warden,

        *Respondent-Appellee.*

No. 01-3613

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 96-00668—George C. Smith, District Judge.

Argued: June 6, 2012

Decided and Filed: July 3, 2013

Before: BATCHELDER, Chief Judge; MARTIN, BOGGS, DAUGHTREY,
MOORE, COLE, CLAY, GIBBONS, ROGERS, SUTTON, COOK, McKEAGUE,
GRIFFIN, KETHLEDGE, WHITE, STRANCH, and DONALD, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Alan M. Freedman, MIDWEST CENTER FOR JUSTICE, LTD., Evanston,
Illinois, for Appellant. Alexandra T. Schimmer, OFFICE OF THE OHIO ATTORNEY
GENERAL, Columbus, Ohio, for Appellee. **ON BRIEF:** Alan M. Freedman, Carol R.
Heise, MIDWEST CENTER FOR JUSTICE, LTD., Evanston, Illinois, for Appellant.
Alexandra T. Schimmer, Thomas Madden, OFFICE OF THE OHIO ATTORNEY
GENERAL, Columbus, Ohio, for Appellee.

      BOGGS, J., delivered the opinion of the court, in which BATCHELDER, C. J.,
GIBBONS, ROGERS, SUTTON, COOK, McKEAGUE, GRIFFIN, and KETHLEDGE,
JJ., joined. DAUGHTREY, J. (pp. 22–34), delivered a separate dissent, in which
MARTIN, MOORE, COLE, CLAY, STRANCH, and DONALD, JJ., joined. WHITE,
J. (pp. 35–41), delivered a separate dissent.

———————————

**OPINION**

———————————

BOGGS, Circuit Judge.  John David Stumpf filed a petition for a writ of habeas corpus in federal district court following unsuccessful state attacks on his conviction and death sentence for a murder that he committed with  Daniel Wesley.   The district court denied the petition.  We reversed that judgment, but the Supreme Court unanimously reversed us. *Bradshaw v. Stumpf*, 545 U.S. 175 (2005).  The court remanded so that we could consider what is now Stumpf's primary argument: that his due-process rights were violated at sentencing.  This is so, he argues, because the State, in a wholly separate proceeding following his conviction and sentence, presented new evidence, which arose after his trial, that Wesley may have actually fired the fatal shots.

Because all of the available evidence was at all times presented to all of the courts involved, and because the Ohio courts, both trial and appellate, independently weighed all of the available evidence and found death to be the proper sentence, no due-process violation occurred.  We now affirm the district court.

I

On May 14, 1984, Stumpf, Clyde Daniel Wesley, and Norman Leroy Edmonds drove along Interstate 70 near Washington, Pennsylvania.  The three had been drinking at a nearby bar and continued to drink from a supply of beer they had in the car.  Also in the car were three handguns:  a nine-millimeter that belonged to Edmonds, a chrome-plated .25-caliber Raven that also belonged to Edmonds, and a .25-caliber Armi that belonged to Wesley.

Around dusk, Stumpf, Wesley, and Edmonds pulled over in Guernsey County, Ohio.  Stumpf and Wesley walked to a home some hundred yards away from the road and rang the doorbell.  Both were armed.  Norman Stout and his wife, Mary Jane, were seated at their kitchen table.  Mr. Stout answered the door.  Stumpf and Wesley

convinced Mr. Stout to let them in the house, claiming that they needed to use the phone. Robbery, though, was their aim. After Stumpf used the phone—and wiped it with a handkerchief—he and Wesley drew their guns and told the Stouts that a robbery was in progress. Stumpf and Wesley herded the Stouts into a bedroom, where Stumpf held them at gunpoint while Wesley scoured the house.

Mr. Stout eventually moved toward Stumpf. Stumpf shot him between the eyes with the Raven. Undeterred, Mr. Stout grappled with Stumpf, who pushed him into a second bedroom across the hall. Although Mr. Stout does not remember when, he was shot again, this time in the top of the head. Mr. Stout also suffered a bruise consistent with being struck by the butt end of a gun. The next thing that Mr. Stout remembers is hearing two male voices conversing in a normal tone, followed by four gunshots. Mr. Stout again lost consciousness; his next recollection was being in the ambulance on the way to the hospital.

The four shots that Mr. Stout heard were the shots that killed his wife, Mary Jane. Three went into the left side of her face, one went through her left wrist. All four bullets came from the same gun, as did the bullets used to shoot Mr. Stout.[1] Stumpf and Wesley drove off in Mrs. Stout's car with the proceeds of their crime. Stumpf threw the Raven out the window.

Edmonds, who had been waiting in the car on the side of the road, saw Mrs. Stout's car pull out of the garage. Frightened, he drove away. He stopped for gas in New Concord, Ohio, made a phone call to his family in Texas, and left without paying for his gas. Two men chased him, but quit their pursuit when Edmonds fired his nine-millimeter pistol at them. Edmonds went back to Washington, Pennsylvania.

The next day, Stumpf and Wesley abandoned Mrs. Stout's car after wiping it clean of fingerprints. They reunited with Edmonds, and sold the nine-millimeter pistol

---

[1]The Raven was never recovered. It was clear, however, that the .25-caliber Armi fired only one round, and that all of the other bullets found at the scene were fired from the same gun.

and a .357 Magnum that they stole from Mr. Stout for travel money. Wesley and Edmonds drove back to Texas; Stumpf stayed in Pennsylvania.

Investigators found Edmonds by tracing the phone call that he made from the gas station. After his arrest, Edmonds implicated Stumpf and Wesley. The police issued arrest warrants for both. When he learned of the warrant for his arrest, Stumpf surrendered, denying any involvement in the crimes. After he found out that Mr. Stout survived, however, Stumpf admitted that he participated in the robbery and that he shot Mr. Stout in the head. Still, he claimed that he went straight to Mrs. Stout's car after shooting Mr. Stout, and thus was not in the house when Mrs. Stout was killed.

Prosecutors indicted Stumpf on charges of aggravated murder, attempted aggravated murder, aggravated robbery, and two counts of grand theft—one of an automobile and the other of a firearm. Included with the aggravated-murder charge were four specifications, three of which made Stumpf eligible for the death penalty. Stumpf waived his right to be tried by a jury, and the case proceeded in front of a three-judge panel. Before trial began, Stumpf decided to plead guilty. The plea bargain provided that Stumpf would plead guilty to aggravated murder, aggravated attempted murder, and the specification of using a firearm while committing a felony. He also admitted to one of the three capital specifications charged—committing murder for the purpose of escaping detection, apprehension, trial, or punishment for attempted robbery and attempted aggravated murder. In return, the State would drop the remaining charges. The three-judge panel conducted an evidentiary hearing to determine whether there was a factual basis. Satisfied that there was, the panel conducted a colloquy and accepted Stumpf's plea.

Because Stumpf was eligible for the death penalty even after his plea, the three-judge panel held a sentencing hearing. There, Stumpf's leitmotif was that he acted under Wesley's influence. He claimed that his propensity for being a follower, rather than a leader, his consumption of alcohol, his youth,[2] and his limited mental abilities made him

---

[2]Stumpf was twenty-three at the time of the crime.

extraordinarily susceptible to Wesley's influence. Stumpf also suggested that his respect for women generally and his lack of a significant criminal history reinforced the claim that he was simply following Wesley's lead. Finally, Stumpf argued—based on his own unsworn statement and inferences drawn from the evidence—that he was a participant in Mrs. Stout's murder, but not the principal offender.[3] He claimed that he dropped the Raven during his struggle with Mr. Stout and ran out of the house in panic, then remained outside of the house until Wesley instructed him to drive Mrs. Stout's car, after Wesley fired the shots that killed Mrs. Stout.

The State told a different story. It emphasized that Stumpf "did most of the talking . . . [and was] the one that used the telephone" when Stumpf and Wesley first approached the Stouts' home, noted that Stumpf wiped his fingerprints off of the receiver after he finished using it, and reminded the judges that Mr. Stout did not recall Stumpf dropping his gun and did hear two male voices conversing at a normal volume before hearing the four gunshots that killed his wife. In addressing the principal-offender argument directly, the prosecutor said:

> I don't believe it is necessary for this court to conclude that [Stumpf] was the principal offender, that is, the actual shooter. I think there is ample evidence—I'm not conceding that at all. I think there's ample evidence in this record that this defendant fired the four shots into the body of Mary Jane Stout.

The prosecutor then pointed to inconsistencies in accounts that Stumpf had given at various points and continued: "So, there's ample, ample evidence in this record to make the reasonable inference that this defendant shot both those individuals." Still, the State again emphasized, the panel could impose the death penalty even if it did not believe that Stumpf had killed Mrs. Stout himself. The panel, after deliberation, found "beyond a reasonable doubt that the defendant was the principal offender" in Mrs. Stout's murder and imposed the death penalty.

---

[3] At pages 31–32, Judge Daughtrey seems distressed that Stumpf's original sentencing hearing was conducted "without the benefit of any eyewitness testimony proving that Stumpf was the trigger man . . . ." Of course, the most percipient eyewitness, Mrs. Stout herself, was unfortunately deceased (for reasons not the fault of the prosecution).

Meanwhile, Wesley had been arrested in Texas. After being extradited to Ohio, he shared a cell with James Eastman. Eastman claimed that Wesley told him that he, not Stumpf, fired the shots that killed Mrs. Stout. Wesley stood trial in front of a jury. The same judge who presided over Stumpf's three-judge panel presided over Wesley's trial. The same prosecutor tried the case. This time, after presenting Eastman's evidence,[4] the prosecutor argued that Wesley was the principal offender and therefore deserved to be put to death. Wesley, who took the stand in his own defense, claimed that Stumpf shot Mrs. Stout. Wesley's counsel also noted that the prosecutor had taken the position that Stumpf was the principal offender in Stumpf's trial, and that Stumpf had been sentenced to death for the crime. The jury found Wesley guilty of aggravated murder and, after a sentencing trial, recommended that he be sentenced to life in prison, with the possibility of parole after twenty years.

When Wesley's trial ended, Stumpf, whose case was still pending on direct appeal, went back to the three-judge panel. He asked that the panel either allow him to withdraw his guilty plea or vacate his death sentence. Eastman's testimony and the State's presenting that testimony at Wesley's trial, Stumpf argued, cast doubt on his conviction and sentence. The State—again represented by the same prosecutor who tried both Stumpf and Wesley—disagreed. At a hearing conducted by two of the three judges who heard Stumpf's case (the other judge having died in the interim), the prosecutor argued that the panel first must determine whether Eastman's testimony changed its earlier principal-offender determination. If that determination changed, the prosecutor suggested, the court should consider whether the death penalty was still appropriate.

Nevertheless, the prosecutor urged that ballistics evidence and Wesley's testimony suggested that Stumpf, not Wesley, was the principal offender. One of the judges responded:

---

[4] Justice Souter does use the term "witness it had vouched for" in reference to Eastman, *Bradshaw v. Stumpf*, 545 U.S. 175, 1189 (2005) (Souter, J., concurring), and perhaps that is the source of Judge Daughtrey's repeated use of that term. *See* J. Daughtrey Dissent, at 26, 29, 32. However, of course, it would have been improper and indeed probably reversible error for the state to have "vouched for" the witness it presented. *See United States v. Reid*, 625 F.3d 977, 982 (6th Cir. 2010).

> [I]f we had not been satisfied that Stumpf was, in fact, the trigger man, the principal offender, and we were satisfied that he was, in fact, an aider and abettor, that may very well have had an effect upon this Court's determination of whether the death penalty should follow. I'm not saying it would, but it's possible.

The prosecutor agreed, suggesting that "the first decision this Court would have to make is whether or not this additional information changes the picture as to that finding that was previously made." The judge persisted, asking whether there was any evidence "[i]n the record so far that, in fact, Wesley was the trigger man." Stumpf's counsel pointed to Eastman's testimony at Wesley's trial. The judge asked: "don't we have some right to read that and determine whether that is, in fact, credible testimony?" Stumpf's counsel answered in the affirmative. The judge then told the parties: "I haven't read it [Eastman's testimony]. I'm certainly going to take the privilege to do so. . . . I'm going to read both Eastman and Wesley because I didn't have the privilege of hearing that testimony."[5]

Stumpf's original panel denied relief in a summary order, stating that "the court took [Stumpf's motions] under advisement and after having considered the same, does overrule the Motion to Withdraw Former Plea and the Alternative Motion to Set Aside the Sentence Imposed." The case returned to the Ohio Court of Appeals. There, Stumpf assigned a number of errors, including a claim that the panel should have vacated his sentence in light of Eastman's testimony. The Court of Appeals disagreed. First, it addressed the panel's decision directly, flatly rejecting the proposition that the State's trying Wesley as a principal offender after securing a conviction against Stumpf made either Stumpf's conviction or the imposition of the death penalty inappropriate. Then, as it was obligated to do under Ohio Revised Code § 2929.05, the Court of Appeals independently weighed "the facts and other evidence disclosed in the record in the case," *id.* § 2929.05(A), including Eastman's testimony. It "independently . . . examine[d] two . . . questions: (1) Do the facts and evidence in the record satisfy *us* that the aggravating circumstances of which Stumpf was found guilty outweigh the mitigating factors? and,

---

[5]The other judge, of course, had heard Wesley's and Eastman's testimony, since he presided at Wesley's trial.

(2) Is the sentence of death appropriate?"   The court emphasized:   "We must be independently persuaded that the answer to both of these questions is 'yes' to affirm the death sentence."   The court answered the first question in the affirmative.   Addressing the second, it specifically found that "the evidence supports the conclusion that it was Stumpf, not Wesley, who pulled the trigger that propelled the four bullets into the body of the victim."   The court affirmed.

Stumpf continued to pursue appellate relief, this time in the Ohio Supreme Court. Like the Ohio Court of Appeals, that court first considered Stumpf's claim that the panel erred, either by refusing to let him withdraw his plea or by refusing to vacate his death sentence.   The court held that neither decision was error.   First, it concluded that the panel correctly decided that Stumpf was not entitled to withdraw his guilty plea.   Then, the court considered the impact of Eastman's testimony directly, noting Stumpf's argument that Eastman's "testimony would have tended to establish a mitigating factor . . . and therefore a new sentencing hearing is necessary in order to allow the panel to consider it."   *State v. Stumpf*, 512 N.E.2d 598, 608 (Ohio 1987).   It first analogized Stumpf's request to "a motion for new trial based upon newly discovered evidence,"[6] *ibid.*, and therefore held that the abuse-of-discretion standard applied.   The court then specified that "[a] defendant is not entitled to a new sentencing hearing merely by coming forward with some additional evidence after the initial sentencing hearing," suggested that the panel "apparently determined that Eastman's testimony added insufficient mitigating weight to affect its balancing of the mitigating factors against the

---

[6]Judge White faults the Ohio Supreme Court for disregarding the alleged reality that the proceeding before the two judges who refused to vacate Stumpf's sentence amounted to a resentencing, as opposed to a motion for a new trial. J. White Dissent, at 35. Accordingly, she posits that Stumpf's sentence must be invalid because Ohio law requires the unanimous vote of a jury or a three-judge panel in order to impose death. OHIO REV. CODE § 2929.03(D)(2). Stumpf has not presented this argument to this court, and for good reason: it does not present a question of federal law. The legal nature of Stumpf's motion is purely a question of Ohio law, over which the Ohio Supreme Court is the ultimate arbiter. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."). Stumpf presented this very question to the state supreme court, which determined that, under the laws of Ohio, his motion was akin to a motion for a new trial and thus amenable to adjudication by two members of the three-judge panel. *Stumpf*, 512 N.E.2d at 608–09. Even if we were to assume *arguendo* that the Ohio Supreme Court misinterpreted its own law (a highly dubious assumption), such an error could not serve as a basis for federal habeas relief. *See Estelle v. McGuire*, 502 U.S. 62, 67 (1991) ("We have stated many times that federal habeas corpus relief does not lie for errors of state law." (internal quotation marks omitted)).

aggravating circumstance," and found "no error in that determination." *Id.* at 609.  It explained: "Eastman's testimony is hearsay and, in the face of the evidence adduced at appellant's sentencing hearing, of minimal weight.  As such, it is too attenuated to warrant a vacation of appellant's sentence and a new sentencing hearing." *Ibid.*

After considering Stumpf's assignments of error, the Ohio Supreme Court independently considered whether the crime's aggravating circumstances outweighed any mitigating factors, as it too was required to do under Ohio Revised Code § 2929.05. It answered in the affirmative, making a special "find[ing] that the testimony of a cellmate during Clyde Wesley's trial is of minimal credibility." *Stumpf*, 512 N.E. at 610. The court then moved to its "final task . . . to determine whether the sentence of death is appropriate." *Ibid.*  It held:

> the imposition of the death penalty in the cause *sub judice* is neither excessive nor disproportionate.  Further, the fact that appellant's co-defendant Wesley received a life sentence with parole eligibility after twenty years for his part in Mrs. Stout's murder is not an impediment to affirming the death sentence in the instant case.  The life sentence given to Wesley is the verdict of a jury in a separate trial.

*Id.* at 611.

After unsuccessfully pursuing state post-conviction remedies, Stumpf filed a petition for writ of habeas corpus in federal court.  The district court denied relief, but granted a certificate of appealability on four claims: (1) that Stumpf's guilty plea was not knowing or voluntary; (2) that the state's first presenting, then casting doubt on, Eastman's evidence violated his due-process rights; (3) that he received ineffective assistance of counsel at sentencing; and (4) that the Ohio death-penalty statute was unconstitutional, facially and as-applied. *Stumpf v. Mitchell*, 367 F.3d 594, 596 (6th Cir. 2004).  With one judge dissenting, we reversed on "either or both" of the first two grounds. *Ibid.*

The Supreme Court granted certiorari and unanimously reversed in part, vacated in part, and remanded.[7] We erred, the Court first held, by finding that Stumpf's plea was unknowing and involuntary. *Bradshaw v. Stumpf*, 545 U.S. 175, 182–86 (2005). Also in error was our holding "that prosecutorial inconsistencies between the Stumpf and Wesley cases required voiding Stumpf's guilty plea," since "the precise identity of the triggerman was immaterial to Stumpf's conviction for aggravated murder . . . . [and] Stumpf has never provided an explanation of how the prosecution's postplea use of inconsistent arguments could have affected the knowing, voluntary, and intelligent nature of his plea." *Id.* at 186–87. The Court, however, suggested that "[t]he prosecutor's use of allegedly inconsistent theories may have a more direct effect on Stumpf's sentence . . . for it is at least arguable that the sentencing panel's conclusion about Stumpf's principal role in the offense was material to its sentencing determination." *Id.* at 187. It noted that the majority did not clearly distinguish between Stumpf's challenge to his conviction and his challenge to his sentence. Thus, the Court "expressed no opinion on whether the prosecutor's actions amounted to a due process violation, or whether any such violation would have been prejudicial," with respect to Stumpf's sentencing claim. *Ibid.* Instead, the Court gave us "the opportunity to consider, in the first instance, the question of how Eastman's testimony and the prosecutor's conduct in the Stumpf and Wesley cases relate to Stumpf's death sentence in particular." *Id.* at 187–88.

On remand, again with one judge dissenting, we held that the State violated Stumpf's due-process rights by presenting, then casting doubt on, Eastman's testimony. Stumpf suffered prejudice from this violation, we reasoned, "[b]ecause all indications are that the three-judge panel that sentenced Stumpf to death would not have done so had the state not persisted in" arguing that Stumpf was the principal offender. *Stumpf v. Houk*, 653 F.3d 426, 439 (6th Cir. 2011). We granted rehearing *en banc* and vacated that opinion. *Id.* at 426.

---

[7]Two Justices filed separate concurring opinions.

II

"Because Stumpf filed his habeas petition before enactment of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), we review his claims under the standards of the pre-AEDPA habeas statute." *Stumpf*, 545 U.S. at 182. "Thus, we presume the correctness of state court factual findings, which are rebuttable only by clear and convincing evidence," *Abdur'Rahman v. Colson*, 649 F.3d 468, 472 (6th Cir. 2011), but review questions of federal law and mixed questions of federal law and fact *de novo*. *Sowell v. Anderson*, 663 F.3d 783, 789 (6th Cir. 2011). We therefore consider Stumpf's due-process claim, which presents a mixed question of law and fact, *de novo*.

III

A

The Due Process Clause prohibits the state from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

> As applied to a criminal trial, denial of due process is the failure to observe that fundamental fairness essential to the very concept of justice. In order to declare a denial of it we must find that the absence of that fairness fatally infected the trial; the acts complained of must be of such quality as necessarily prevents a fair trial.

*Lisenba v. California*, 314 U.S. 219, 236 (1941).[8] "In the field of criminal law, [the Supreme Court has] defined the category of infractions that violate 'fundamental fairness' very narrowly based on the recognition that, beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation." *Medina v. California*, 505 U.S. 437, 443 (1992) (internal quotation marks and alterations omitted). Thus, state action "is not subject to proscription under the Due Process Clause

---

[8] There are two species of due-process claims in criminal cases. State action that "shocks the conscience" violates the Due Process Clause's substantive component. *Rochin v. California*, 342 U.S. 165, 172 (1952) (Frankfurter, J.). State action that deprives a defendant of a fundamentally fair trial violates the Due Process Clause's procedural component. *Medina v. California*, 505 U.S. 437, 443 (1992) (internal quotation marks and alterations omitted). Neither Stumpf, nor our prior opinions, nor even the Supreme Court majority, specifies which kind of violation allegedly occurred here. We, like Justice Souter, "understand Stumpf to claim that it violates the basic due process standard, barring fundamentally unfair procedure, to allow his death sentence to stand." *Stumpf*, 545 U.S. at 188 (Souter, J., concurring).

unless 'it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Patterson v. New York*, 432 U.S. 197, 201–02 (1977) (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 105 (1934) (Cardozo, J.)); *see also Medina*, 505 U.S. at 443.

To determine whether any such thing happened here, we must consider the precise nature of Stumpf's claim. Stumpf does not argue that the State knowingly misrepresented evidence, *Miller v. Pate*, 386 U.S. 1 (1967), presented false or misleading testimony, *Mooney v. Holohan*, 294 U.S. 103 (1935), failed to correct false testimony, *Napue v. Illinois*, 360 U.S. 264 (1959), or withheld materially exculpatory evidence, *Brady v. Maryland*, 373 U.S. 83 (1963). Nor does he claim that new evidence suggests that he is actually innocent, *Herrera v. Collins*, 506 U.S. 390 (1993), nor that the state withheld materially exculpatory evidence that it discovered after sentencing, *cf. Dist. Attorney's Office for the Third Judicial Dist. v. Osborne*, 557 U.S. 52 (2009). Instead, Stumpf claims that the State's argument about Eastman's testimony at the hearing on his *post-sentencing* motion retroactively rendered his sentence—which was the result of *earlier* proceedings that he does not challenge—fundamentally unfair because the State's argument about Eastman's testimony at his post-sentencing hearing differed from the State's argument about the same testimony in Wesley's trial. This is so, Stumpf urges, even though his sentencing panel, the two appellate panels conducting mandatory independent review, and the jury in the other case were able to consider the same body of evidence and hear argument from the State and the defendant about the evidence in both cases.

To state Stumpf's claim is to refute it. Nothing misleading or deceitful happened here. The prosecution did not present a different and incomplete set of facts in support of different theories of culpability for the same crime. *Cf. Thompson v. Calderon*, 120 F.3d 1045, 1056 (9th Cir. 1997) (en banc) (plurality opinion) ("The prosecutor *presented* markedly different and conflicting *evidence* at the two trials.") (emphasis added), *vacated on other grounds*, 523 U.S. 538 (1998). It did not offer different (and contradictory) testimony from the same witness in Wesley's trial, without

acknowledging the contradiction.  *Cf. Smith v. Groose*, 205 F.3d 1045, 1051 (8th Cir. 2000) ("[T]he prosecutor chose at Smith's trial to use Lytle's December 2, 1983, statement to secure Smith's conviction and then later, at Cunningham's trial, elected to use Lytle's November 30, 1983, statement to secure Cunningham's conviction. Lytle's testimony constituted the only evidence of when the murders occurred and was the sole basis for two different convictions on two contradictory theories.").  And it did not omit evidence of Wesley's or Stumpf's guilt or innocence from its presentation.  *Cf. In re Sakarias*, 106 P.3d 931, 936–37 (Cal. 2005) (discussing prosecutor's omission of key evidence in each of two prosecutions of co-defendants, leading to conviction of both). Eastman's evidence did not exist during Stumpf's original sentencing proceeding.  After the State  presented Eastman's hearsay statement in Wesley's trial and Stumpf moved for relief, the State stipulated to the evidence's admissibility.  Then, three panels in Stumpf's case were able to consider the mitigating evidence at issue, Eastman's claim that Wesley had admitted to firing the shots that killed Mrs. Stout.  Each had the opportunity to weigh that evidence against all of the other evidence in the record. Despite Eastman's testimony, each concluded that the death penalty was appropriate. All that the prosecution did was to argue for two different inferences from the same, unquestionably complete, evidentiary record.  It left the factfinder in Wesley's trial and the factfinders in Stumpf's post-sentencing proceedings to find the facts.  This, without more, does not offend the Due Process Clause.

Stumpf's paean to the prosecutor's duty does not change this conclusion.  It is true that, "while [a prosecutor] may strike hard blows, he is not at liberty to strike foul ones."  *Berger v. United States*, 295 U.S. 78, 88 (1935).  And indeed, a defendant is entitled to relief when a prosecutor's "comments so infect[] the trial with unfairness as to make the resulting conviction a denial of due process."  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (internal quotation marks omitted).  But there is nothing foul about the prosecutor's conduct here.  Each of the prosecutor's two arguments, taken alone, was proper.  Each rested on a full evidentiary record.  In each instance, opposing counsel responded to the State's argument by pointing out the inconsistency in the

State's theory. The mere fact that the State argued for different inferences in different cases does not make either argument so unfair that it violates the Due Process Clause.

This is a stark contrast to Supreme Court cases where a prosecutor's conduct violated the Due Process Clause. In each of those cases, the prosecutor did something to subvert the very foundation of the trial, something that kept the factfinder from making a fully informed decision. Thus, in *Miller*, 386 U.S. at 6–7, the Court held that a prosecutor's "consistent and repeated misrepresentation [reinforced by testimony from a state chemist] that [a paint-stained pair of underwear] was, indeed, 'a garment heavily stained with blood'" violated the Due Process Clause. Likewise, in *Mooney*, 294 U.S. at 112, the Court explained that "depriving a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony *known to be perjured*" was a due-process violation. (emphasis added); *see also Giglio v. United States*, 405 U.S. 150 (1972). *Napue*, 360 U.S. at 269, followed suit, confirming that a due-process violation occurs "when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." And, of course, *Brady*, 373 U.S. at 87, held that a state may not withhold materially exculpatory evidence that it possesses before trial. In each case, the prosecutor's action prevented the factfinder from making a fully informed decision; in each case the prosecutor's action violated the Due Process Clause's guarantee of fundamentally fair proceedings.

Here, by contrast, the prosecution presented all of the evidence that it had. The factfinders then had—and took—the opportunity to consider the entire record. First was Stumpf's original sentencing panel. There, the very judge who speculated that, were Stumpf an aider and abettor, the panel's sentencing determination *may* have been different told the parties in open court: "I haven't read it [Eastman's testimony]. I'm certainly going to take the privilege to do so. . . . I'm going to read both Eastman and Wesley because I didn't have the privilege of hearing that testimony." The other judge on the panel had presided at Wesley's trial and thus heard Eastman's testimony live. After considering Eastman's testimony, Wesley's testimony, and the evidence that it had already heard, the panel declined to revisit its earlier determination that the death penalty

was appropriate. Two more independent reviews followed; twice more Stumpf was able to argue that the inconsistency in the prosecutor's argument meant that he should not be sentenced to death before a panel required independently to weigh aggravating factors and mitigating factors and determine whether the death penalty was warranted. Twice more the Ohio courts held that the death penalty was appropriate. That Stumpf lost means neither that the factfinders failed to consider his argument, nor that the process used to affirm his death sentence was fundamentally unfair. A criminal defendant has the right to a fair proceeding in front of an impartial factfinder based on reliable evidence. He does not have the right to prevent a prosecutor from arguing a justifiable inference from a complete evidentiary record, even if the prosecutor has argued for a different inference from the then-complete evidentiary record in another case. The prosecutor's allegedly inconsistent arguments do not violate the Due Process Clause.

B

The arguments made in Judge Daughtrey's dissent rely on an alternate interpretation of the record, one colored by the dissent's condemnation of the "utter disregard displayed by both the *Ohio courts* and the majority . . . for the crux of Stumpf's habeas claim." J. Daughtrey Dissent, at 29 (emphasis added). The dissent does not differ with the accuracy of our quotations from the record, nor we with its. But the Ohio courts had before them every speck of available testimony in both trials, which were presided over and reviewed by jurists who were fully capable of assessing the merits of a lawyer's argument.

The instant case involves the presentation of legal arguments to a panel of judges, not the presentation of perjured testimony to a jury, as referenced *id.* at 30. Judge Daughtrey's dissent charges the prosecution with "misrepresenting the strength of Stumpf's motion" (otherwise known as arguing against it), and "refusing to admit to the egregious mistake made during Stumpf's original trial." *Ibid.* As to the latter point, it is not clear if the mistake is in not wholly believing Eastman, or in not "admit[ting]" that Eastman's jailhouse testimony somehow completely and retroactively subverts the

concededly fair trial that originally occurred. In either event, it is inconceivable that the prosecution's *argument* before the subsequent panel of judges is analogous to the presentation of perjured testimony or the misrepresentation of evidence. Making legal arguments from the record (which contained the testimony of Eastman and much evidence in contradiction, including testimony from Wesley himself) can hardly be called "chicanery," an "affirmative effort to deceive the court," or "a refusal to correct known error." *See ibid.*

To the extent that the Ohio courts drew the conclusion that Stumpf was the principal offender in this crime, it is hardly obvious from the record that this conclusion was "less-than-accurate," and it is obvious that the conclusion did not go"unchecked." *See ibid.* The state introduced the very evidence that would be thought to check that impression and for which it had to answer in its argument before the Ohio courts. It would appear that what the dissent is charging as constitutional error is nothing more nor less than the crime charged against Socrates: that he "made the worse appear the better cause." *See* Plato, *Apology* (Benjamin Jowett trans.), *in* 2 *Harvard Classics* 3, 4 (Charles W. Eliot ed., 1909). We reject this contention.

## C

But even if there were a constitutional violation, which there was not, that violation would only warrant granting the writ if it had a "substantial and injurious effect or influence in determining" the outcome of the proceeding. *Rosencrantz v. Lafler*, 568 F.3d 577, 590 (6th Cir. 2009) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)); *Stewart v. Erwin*, 503 F.3d 488, 501 n.5 (6th Cir. 2007) (noting that *Brecht* standard applies to a sentencing challenge).

Because Stumpf asks us to invent a new due-process right, we have never determined whether that right would be subject to harmless-error analysis. But we have no trouble concluding that it would. In *Rosencrantz*, we considered whether a prosecutor's knowing presentation of false testimony was subject to *Brecht*'s harmless-error analysis. We held that it was, noting that the presentation of false evidence was a "trial error—it occurred during the presentation of the case to the jury, and is one which

may be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless." *Rosencrantz*, 568 F.3d at 589 (internal quotation marks and alterations omitted). Here too we consider an alleged error that involves a prosecutor's presentation to a factfinder. If anything, the case for harmless-error analysis is stronger here, where the factfinders were able to consider all of the evidence, and the only alleged violation hinges on the prosecutor's argument, not any suppression or falsification of evidence. *See Broom v. Mitchell*, 441 F.3d 392, 412–13 (6th Cir. 2006) (holding that harmless-error standard applied to claim involving prosecutor's improper comments).

Thus, before we could grant the writ, we would have to conclude that the alleged error had a "substantial and injurious effect or influence in determining" the outcome of Stumpf's sentencing proceeding. *Brecht*, 507 U.S. at 637. The government has the burden of proof in this analysis. *Rosencrantz*, 568 F.3d at 589.

Three Ohio panels considered whether Stumpf deserved the death penalty after Eastman testified in Wesley's trial. Each held that the answer was "yes." Two of the three panels independently weighed Eastman's testimony. The first of those two, the Ohio Court of Appeals, held: "the evidence supports the conclusion that it was Stumpf, not Wesley, who pulled the trigger that propelled the four bullets into the body of the victim." It reached that conclusion in spite of Stumpf's argument that Eastman's testimony cast doubt on his principal-offender designation. The second panel, the Ohio Supreme Court, addressed Eastman's testimony directly, specifically "find[ing] that the testimony of a cellmate during Clyde Wesley's trial is of minimal credibility," in the course of its independent consideration of the aggravating and mitigating factors. *Stumpf*, 512 N.E.2d at 610.

As these Ohio courts held, neither Eastman's testimony nor the prosecutor's argument concerning it had a significant impact, much less a "substantial and injurious effect or influence," *Brecht*, 507 U.S. at 637, on the outcome of Stumpf's sentencing proceedings. The record contained ample evidence to support the conclusion that Stumpf, not Wesley, pulled the trigger. Further, after Eastman's testimony came to light,

Stumpf had two more opportunities to argue, in front of panels required to consider the propriety of the death penalty independently, that Eastman's testimony changed the sentencing calculus. The only thing that Stumpf did not get is something that he is not entitled to: consideration of aggravating and mitigating factors with the evidence construed in his favor—specifically, with the assumption that he was not the principal offender. This is but one view of the evidence. The panels that independently weighed his claim took the other. Thus, even if Stumpf suffered a violation of due process, we cannot say that the violation had a "substantial and injurious effect or influence in determining" the outcome of Stumpf's sentencing proceeding. *Ibid.*

IV

Stumpf also argues that he received ineffective assistance of counsel. To establish this claim, he must show: (1) deficient performance; and (2) prejudice. *Strickland v. Washington*, 466 U.S. 668, 687–96 (1984).

"[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. Thus, our review of counsel's performance "must be highly deferential," and "every effort [must] be made to eliminate the distorting effects of hindsight." *Id.* at 689. Counsel performs deficiently when he makes "errors so serious that [he] was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. "When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 687–88.

But "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691. Therefore, to succeed on his ineffective-assistance claim, Stumpf "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694; *see also Wiggins v. Smith*, 539 U.S. 510, 535 (2003) (noting that, at sentencing, the relevant

prejudice inquiry is whether "had the jury been confronted with this . . . mitigating evidence, there is a reasonable probability that it would have returned with a different sentence").

The gravamen of Stumpf's ineffective-assistance claim is that counsel failed to present three types of evidence at his mitigation hearing: (1) testimony from an independent psychologist about Stumpf's low level of intelligence and his tendency to be a follower, rather than a leader; (2) testimony from jail officers that Stumpf was a model prisoner; and (3) live testimony from a number of family members and friends about Stumpf's background.

At Stumpf's sentencing hearing, defense counsel presented evidence that Stumpf was not intelligent, tended to be a follower, had no significant criminal history, respected women, did not lose his temper, and was not a troublemaker. Stumpf's counsel also elicited live testimony from Stumpf's mother, Stumpf's sister, and nine longtime family friends, and gave the panel an additional sixty "questionnaires," filled out by Stumpf's friends and family, tending to show that Stumpf was a gentle person without a temper who respected women.

Perhaps counsel could have presented a more vivid mitigation case had he followed the path that Stumpf now suggests. Perhaps not. Counsel, through extensive, often-overlapping testimony, made the very points that Stumpf alleges an independent psychiatrist would have made. Counsel presented more than ten character witnesses and sixty "questionnaires" to give the factfinders a vivid image of Stumpf's background and personality. And, although it is true that counsel did not call prison officers to testify about Stumpf's in-prison behavior, testimony about a prisoner's behavior *after* committing murder is, at best, minimally probative of his general temperament *before* committing the crime. In light of the extensive character testimony that counsel produced, it was reasonable not to call Stumpf's prison guards as witnesses. Counsel's representation was not objectively unreasonable within the meaning of *Strickland*.

But even if counsel were remiss in one of the three areas that Stumpf highlights, Stumpf has not shown "a reasonable probability that, but for counsel's unprofessional

errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. The panel had before it evidence of each mitigating factor that Stumpf claims counsel should have presented. The panel heard that Stumpf was not particularly intelligent and was more of a follower than a leader, it heard that he had no criminal record, and it heard that he respected women, did not lose his temper, and was not a troublemaker. "The sentencing [panel] was thus 'well acquainted' with [Stumpf's] background and potential humanizing features. Additional evidence on these points would have offered an insignificant benefit, if any at all." *Wong v. Belmontes*, 130 S. Ct. 383, 388 (2009).

Stumpf's counterargument is unpersuasive. He suggests that, because the sentencing panel found only two mitigating factors—youth and lack of a criminal history—there is a reasonable probability that his sentence would have been different, had counsel presented more or different evidence.[9] This argument suffers from a fatal flaw: the quantity of evidence that a lawyer produces is not necessarily determinative of the quality of his presentation. Here, counsel painted a vivid picture of Stumpf for the factfinders through witness testimony from Stumpf's probation officer, former teachers, family, and friends. That picture was not strong enough to blot out the enormity of Stumpf's crime. Nothing about the evidence that Stumpf suggests counsel should have presented was so striking that there is a reasonable probability that the panel would have chosen a different sentence. Stumpf's ineffective-assistance claim fails.

V

Stumpf has had an extraordinary amount of process—and certainly all of the process that he was due. He was able to argue in front of three separate panels, two of which had an obligation to weigh the propriety of the death penalty independently, that the State's different *arguments* at different proceedings about evidence fully presented fundamentally altered his sentencing calculus. That he lost does not mean that he

---

[9]Stumpf's counsel argued for other mitigating factors, including: (1) it was unlikely that the offense would have occurred without Wesley's influence; (2) Stumpf was not the principal offender; and (3) other relevant factors, including the fact that Wesley was also being prosecuted for the murder.

suffered unfairness, much less the kind of fundamental unfairness that would warrant our setting aside his sentence under the rubric of the Due Process Clause.  The judgment of the district court is AFFIRMED.

––––––––––––––––

**DISSENT**

––––––––––––––––

MARTHA CRAIG DAUGHTREY, Circuit Judge, dissenting.  Because I believe that John David Stumpf did not receive a fair sentencing hearing but is, rather, the victim of prosecutorial gamesmanship serious enough to violate his right to due process, I am compelled to dissent from the majority's opinion.  In my judgment that opinion completely fails to recognize and to address the arbitrary, unreliable aspects of Stumpf's sentence, resorting instead to a recitation of legal platitudes that are presumptuous in their certitude, yet wholly without support in the record.

The majority opinion speaks in terms of broad jurisprudential truths, noting, for example, that  "[t]he Due Process Clause prohibits the state from 'depriv[ing] any person of life, liberty, or property, without due process of law[,]'  U.S. Const. amend. XIV, § 1."  That proposition is beyond dispute.  Similarly, the opinion correctly recognizes Supreme Court precedent holding that "[a]s applied to a criminal trial, denial of due process is the failure to observe that fundamental fairness essential to the very concept of justice." *See Lisenba v. California*, 314 U.S. 219, 236 (1941).  Where the majority goes astray, however, is in the application of these settled legal principles to the facts before us and in its failure to concede that the arbitrariness that permeated the *Stumpf* and *Wesley* proceedings necessarily denied that fundamental fairness.

In the 40 years since the Supreme Court's landmark decision in *Furman v. Georgia*, 408 U.S. 238 (1972), courts have accepted as axiomatic "that the penalty of death is different in kind from any other punishment imposed under our system of criminal justice." *Gregg v. Georgia*, 428 U.S. 153, 188 (1976).  Furthermore, we have been admonished not to "permit this unique penalty to be . . . wantonly and . . . freakishly imposed." *Furman*, 408 U.S. at 309-10 (Stewart, J., concurring).  To the contrary, when considering "a matter so grave as the determination of whether a human life should be taken or spared," we are directed to take all necessary steps "to minimize the risk of wholly arbitrary and capricious action." *Gregg*, 428 U.S. at 189.  *See*

*Caldwell v. Mississippi*, 472 U.S. 320, 323 (1985) (recognizing "heightened need for reliability in the determination that death is the appropriate punishment in a specific case" (internal quotation marks and citation omitted)).

But rather than take these admonitions to heart, the majority glibly asserts that the actions undertaken and the arguments espoused by the prosecution throughout Stumpf's and Wesley's trials did not risk "arbitrary or capricious action" because the decisions and contentions of the State of Ohio were at all times "consistent and appropriate." In fact, the majority goes so far as to make such explicit statements as: "all of the available evidence was at all times presented to all of the courts involved"; "[n]othing misleading happened here"; "[n]othing deceitful"; "[t]he prosecution did not present a different and incomplete set of facts in support of different theories of culpability for the same crime"; and "there is nothing foul about the prosecutor's conduct here." Apparently by repeating to itself such statements, the majority is able to reach its fanciful conclusion that "[t]he prosecutor's *allegedly* inconsistent arguments do not violate the Due Process Clause." (Emphasis mine.)

It must appear to the reader, as it did to me, that I received an appellate record radically different from the one reviewed by the majority. In fact, my reading of the record led me to the inescapable conclusion, not that "[n]othing misleading happened here" but, to the contrary, that the prosecution in these proceedings continually misled the factfinders; that the prosecution was, if not deceitful, at least willing to play fast and loose with whatever facts would best serve its purposes; and that it most definitely presented "a different and incomplete set of facts in support of different theories of culpability for the same crime." In the end, however, it became clear that the record I reviewed actually conformed to the record before the United States Supreme Court in *Bradshaw v. Stumpf*, 545 U.S. 175 (2005). Indeed, in his concurring opinion, which was joined by Justice Ginsburg, Justice Breyer summarized the issues now before this court by reference to an interpretation of underlying facts wholly at odds with that propounded in the majority opinion. That concurrence explained:

I understand Stumpf to claim that it violates the basic due process standard, barring fundamentally unfair procedure, to allow his death sentence to stand in the aftermath of three positions taken by the State: (1) at Stumpf's sentencing hearing; (2) at the trial of Stumpf's codefendant, Clyde Wesley; and (3) in response to Stumpf's motion to withdraw his guilty plea in light of the State's position at the Wesley trial. *At the hearing on Stumpf's sentence, the State argued that he was the triggerman, and it urged consideration of that fact as a reason to impose a death sentence.* The trial court found that Stumpf had pulled the trigger and did sentence him to death, though it did not state that finding Stumpf to be the shooter was dispositive in determining the sentence. *After the sentencing proceeding was over, the State tried the codefendant, Wesley, and on the basis of testimony from a new witness*[,] *argued that Wesley was in fact the triggerman and should be sentenced to death.* The new witness was apparently unconvincing to the jury, which in any event was informed that Stumpf had already been sentenced to death for the crime; the jury rejected the specification that named Wesley as the triggerman, and it recommended a sentence of life, not death. Stumpf then challenged his death sentence (along with his conviction) on the basis of the prosecution's position in the Wesley case. *In response, the State did not repudiate the position it had taken in the codefendant's case, or explain that it had made a mistake there. Instead, it merely dismissed the testimony of the witness it had vouched for at Wesley's trial* and maintained that Stumpf's death sentence should stand for some or all of the reasons it originally argued for its imposition. *At the end of the day, the State was on record as maintaining that Stumpf and Wesley should both be executed on the ground that each was the triggerman, when it was undisputed that only one of them could have been.*

*Id.* at 188-89 (emphasis added) (citations omitted).

Yet, even in light of Justice Breyer's succinct recapitulation of the prosecution's legerdemain, the majority continues to perform the mental gymnastics necessary to convince itself that Stumpf's death sentence was fundamentally fair and was not imposed arbitrarily. Try as I might, however, I cannot contort the straightforward sequence of events in this matter to reach the conclusion reached by the majority.

At Stumpf's original sentencing hearing, held prior to the State of Ohio's knowledge of Wesley's confession to James Eastman, the panel of three state-court judges concluded that Stumpf should be put to death because the panel determined

"*beyond a reasonable doubt* that [Stumpf] was *the principal offender* in [the murder of Mary Jane Stout]." (Emphasis added.) Indeed, as noted by the district court in denying Stumpf's request for issuance of a writ of habeas corpus, "the trial court cited its finding that petitioner was the actual shooter as a reason, and a very substantial reason, why the aggravating circumstance outweighed the mitigating factors." *Stumpf v. Anderson*, No. C-1-96-668, 2001 WL 242585, at *48 (S.D. Ohio Feb. 7, 2001). Such a conclusion by the sentencing panel of judges was understandable in light of the evidence then before that panel. Although it is true that Stumpf consistently maintained, even at that early stage of the proceedings, that he was not the triggerman ultimately responsible for the murder of Mary Jane Stout, the three-judge panel was forced to determine whether to credit Stumpf's protestations or to agree with the prosecution's view of the evidence then available. Thus, despite the very real possibility that Stumpf did not, in fact, fire the fatal shots that killed Ms. Stout, no due process violation can be said to have occurred at that time.

Nor can the prosecution be faulted for arguing during *Wesley's* trial that it was then convinced that it was actually Wesley, and not Stumpf, who was the triggerman in the murder. It was not until after Stumpf's initial sentencing, and prior to Wesley's trial, that the State of Ohio learned from Eastman that Wesley confessed to him that the fateful events of the day of the murder actually unfolded exactly as Stumpf had claimed. The prosecution cannot, therefore, be condemned for bringing Eastman's testimony to the jury's attention.

At the same time, the *Wesley* jury also cannot be faulted for concluding that Wesley was not the triggerman. Despite the prosecution's arguments during Wesley's trial that recently discovered evidence now pointed the finger of guilt at Wesley as the person responsible for firing the gun that killed Mary Jane Stout, the jurors were also informed by Wesley's defense team that a panel of *judges* had previously determined that it was, in fact, Stumpf who was the triggerman and Stumpf who had been sentenced to death for the Stout murder. Thus, even after Wesley's trial had concluded, Stumpf

had no valid claim that the process by which he was sentenced to die had been tainted by any procedural unfairness.**1**

However, we are still debating the legality and constitutionality of Stumpf's sentence because Stumpf and his lawyers recognized the now-demonstrably false prosecution theory under which he first had been condemned to death. Stumpf thus sought resentencing from the three-judge panel that presided over the punishment phase of his trial. It was at that post-sentencing hearing that the State of Ohio undertook tactics that any reasonable person would by now conclude were unfair and violative of even the most basic conceptions of due process of law.

Having learned of Wesley's jailhouse confession to Eastman, the supporting facts of which Eastman would have had no reason to know absent information from Wesley himself, the prosecution – indeed the very same prosecutor who obtained Stumpf's conviction – had argued in support of, and vouched for, Eastman's credibility during Wesley's trial. Then, when Stumpf subsequently sought to overturn his death sentence on the basis of the position taken by the State of Ohio in Wesley's trial, the same prosecutor once more argued that Stumpf deserved execution at the hands of the state because Stumpf was the triggerman. Again, as noted by Justice Breyer, "the State did not repudiate the position it had taken in [Wesley's] case, or explain that it had made a mistake there." *Bradshaw v. Stumpf*, 545 U.S. at 189 (Souter, J., concurring).

In a baffling effort to bolster its decision to turn a blind eye to the State of Ohio's duplicity, the majority intimates that no due process violation occurred because prosecutors are permitted to argue alternative theories before juries and judges. No such *alternative* arguments were made in this case, however. The prosecutor did not argue

---

**1**Of course, that fact alone highlights a major legal and moral problem with the death penalty. Even before Wesley was tried, the State of Ohio had in its possession evidence establishing that if capital punishment were appropriate at all, it was Wesley and not Stumpf who should be executed. That evidence, however, came into the prosecution's possession only through the fortuitous circumstance of Wesley conversing with a cellmate about the murder. If Wesley had not shared the details of his crime with Eastman, or if Eastman had not brought that information to the attention of the authorities, there would have been no way to verify the truthfulness of Stumpf's account. Consequently, the State of Ohio might have executed an individual who otherwise would not have been sentenced to death – indeed, who would not even have been eligible for the death penalty. Because of the majority's intransigence, that possibility of wrongful execution continues to exist.

at Wesley's trial that either Stumpf or Wesley – one or the other – was the actual triggerman. Instead, as an officer of the court, the prosecutor elicited testimony that Wesley was the principal offender and, as such, was deserving of execution. Later, still operating as an officer of the court, the same prosecutor, without any explanation for repudiation of his prior position, returned to his original argument that sought to portray Stumpf as the triggerman. Such convenient flip-flopping by a government official sworn to uphold justice simply reeks of unfairness. In fact, the only rationale I can envision for the prosecution's (and now the majority's) acceptance of the legitimacy of such tactics is an unwavering commitment to a win-at-any-cost callousness that is directly at odds with our solemn oath to preserve and defend the Constitution of the United States.

The majority also attempts to legitimize the prosecution's blatant opportunism in this matter by attributing to the judicial panel that ruled upon Stumpf's motion for resentencing the assumption that Eastman must not have been a credible witness at Wesley's trial, given the fact that the jury spared Wesley from the death penalty. The bases for this shaky claim are the majority's assertion that "[t]hree Ohio panels considered whether Stumpf deserved the death penalty after Eastman testified in Wesley's trial," and its conclusion that "neither Eastman's testimony nor the prosecutor's argument concerning it had a significant impact, much less a 'substantial and injurious effect or influence,' on the outcome of Stumpf's sentencing proceedings." These justifications ring hollow. Indeed, the majority's very formulation of its argument in this regard demonstrates its blindness to the true constitutional issues presented by Stumpf's challenge.

The fact that "[t]hree Ohio panels" found Eastman's testimony to be of minimal credibility is completely irrelevant to the issue of whether Stumpf's due process rights have been compromised. The majority seeks to emphasize determinations of the weight of the trial and post-trial evidence but completely ignores what should be the true issue here: the integrity of the process by which arguments concerning Stumpf's death-worthiness were placed before those three panels. As stated previously, it comes as no surprise that the jury in Wesley's trial chose not to credit Eastman's testimony. After

all, the State of Ohio was proffering testimony in that proceeding that contradicted directly the factual findings and legal determinations already made by three members of the state judiciary. Given that determination, it also would not be surprising that the panel of state judges did not alter its conclusion based upon the introduction of jailhouse testimony only.

In regard to that panel and its ruling on Stumpf's motion for resentencing, I marvel at the cavalier attitude with which the majority minimizes the importance of the fact that only two of the original three judges who sentenced Stumpf were able to state that the knowledge that Stumpf might not have been the triggerman would not have altered their belief that he was properly condemned to be executed. As was noted in our now-vacated panel opinion in Stumpf's appeal from the denial of his petition for habeas relief:

> [D]uring the hearing on Stumpf's motion to withdraw his guilty plea following his conviction and sentencing, one of the three judges who sentenced Stumpf to death noted, "[I]f we had not been satisfied that Stumpf was, in fact, the trigger man, the principal offender, and [if instead] we were satisfied that he was, in fact, an aider and abettor, that may very well have had an effect upon this Court's determination of whether the death penalty should follow. I'm not saying it would, but it's possible.'"[2]

*Stumpf v. Houk*, 653 F.3d 426, 437 (6th Cir. 2011). Just how likely such a reversal of the original sentence might have been will never be known, because one of the three sentencing judges died prior to the hearing on Stumpf's motion for withdrawal of his guilty plea and resentencing. Admittedly, the trial court's ruling on the motion might not have changed even if the third judge had survived and found pause in the fact that

---

[2]This Ohio judge undoubtedly had in mind the Supreme Court's admonition in *Enmund v. Florida*, 458 U.S. 782, 797 (1982):

> Although the judgments of legislatures, juries, and prosecutors weigh heavily in the balance, it is for us ultimately to judge whether the Eighth Amendment permits imposition of the death penalty on one such as Enmund who aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed. We have concluded, along with most legislatures and juries, that it does not.

the basis for the panel's original sentencing decision had been severely undercut. Nevertheless, for the majority of this court to discount so completely the possible effect of Eastman's testimony on the third sentencing judge is disingenuous.

What is even more surprising and disturbing is, once again, the utter disregard displayed by both the Ohio courts and the majority here for the crux of Stumpf's habeas claim. What is most relevant in this court's review is *not* whether Eastman's testimony at Wesley's trial was more believable than the suppositions offered by the prosecution at Stumpf's trial. Rather, what is most relevant is whether it was blatantly unfair for the prosecutor in Wesley's case to vouch for the credibility of Eastman and then intimate at the hearing on Stumpf's post-sentencing motion that the very same information elicited by the State of Ohio at Wesley's trial became, without any intervening contrary information, completely unworthy of belief.

The majority is quick to dismiss Stumpf's claims of patent unfairness, stating cursorily that Supreme Court cases in which a prosecutor was found to have violated the Due Process Clause were distinguishable because, in those cases, "the prosecutor did something to subvert the very foundation of the trial, something that kept the factfinder from making a fully informed decision." Interestingly, a thoughtful examination of Stumpf's habeas claim reveals that he is making an identical argument – "the prosecutor did something to subvert the very foundation of the trial, something that kept the factfinder from making a fully informed decision." Moreover, *Miller v. Pate*, 386 U.S. 1 (1967), *Mooney v. Holohan*, 294 U.S. 103 (1935), and *Napue v. Illinois*, 360 U.S. 264 (1959), the cases upon which the majority relies, condemn exactly the type of prosecutorial misconduct that occurred in this case.

As noted by the majority, *Miller* involved a knowing misrepresentation of evidence by the state. In that case, the prosecutor represented to the jury, through the testimony of an expert witness, that blood stains matching the victim's blood type were found on an item of clothing recovered a mile from the crime scene. *Miller*, 386 U.S. at 3-4. As was later discovered, however, the prosecution was aware at the time of Miller's trial that the stains were remnants of paint, not blood. *Id.* at 5-6. Holding that

due process principles will not "tolerate a state criminal conviction obtained by the knowing use of false evidence," the Supreme Court reversed the lower court's denial of a writ of habeas corpus. *Id.* at 7.

The prosecutor in Stumpf's and Wesley's proceedings was guilty of the same type of malfeasance. Either he suborned perjury in Wesley's trial by presenting Eastman's testimony that Wesley confessed to being the triggerman, or else the prosecutor later misrepresented the strength of Stumpf's motion to set aside his sentence by refusing to admit to the egregious mistake made during Stumpf's original trial. By thus withholding from the reconstituted sentencing panel information regarding the state's belief in the veracity of Eastman's testimony, the prosecution in this case misrepresented evidence just as egregiously as did the prosecution in *Miller*.

In *Mooney*, the state presented testimony it knew to be perjured. *Mooney*, 294 U.S. at 112. Disapproving of such tactics, the Supreme Court noted that "safeguarding the liberty of the citizen against deprivation through the action of the state, embodies the fundamental conceptions of justice which lie at the base of our civil and political institutions." *Id.* Thus, in *Mooney*, the actions of the prosecutor were found to undermine the basic tenets of due process.

The actions of the prosecutor in Stumpf's case did no less. One can only hope that Stumpf's prosecutor did not knowingly present false testimony to the *Wesley* jury. Even if he did not, however, given his arguments during the hearing on Stumpf's post-sentencing motion, the prosecutor misled that court by failing to emphasize the fact that new information had come to light that effectively exonerated Stumpf as the principal offender in the murder of Mary Jane Stout. Whether the chicanery of the prosecutor involved affirmative efforts to deceive the court or simply a passive refusal to correct known error is irrelevant. In either instance, acts were perpetrated by the state that left Stumpf's sentencing panel with a less-than-accurate impression of the extent of Stumpf's role in the murder at issue. Thus, by knowingly allowing the impression that Stumpf was the triggerman to go unchecked, Stumpf's prosecutor also intentionally misled the court and subverted the very underpinnings of our criminal justice system.

Finally, the majority asserts that the Supreme Court's decision in *Napue* is not relevant to the issues presented in this habeas appeal – another instance in which the majority is simply off the mark. *Napue* stands for the proposition that due process is denied a criminal defendant when the prosecution "allows [false testimony] to go uncorrected when it appears." *Napue*, 360 U.S. at 269. According to the majority, because no "false testimony" was presented during Stumpf's proceedings, *Napue* cannot serve to buttress Stumpf's claims of a due-process denial. But, the majority's reading of Supreme Court precedent is far too narrow. Obviously, a prosecutor's failure to correct false testimony denies to a criminal defendant the right to a fair trial conducted in accordance with established tenets of fairness, honesty, and integrity. But, to allow a court to continue to rely upon unfounded information without correction by the prosecution, when the prosecutor knows that the basis for the court's decision has been undermined by subsequent revelations, is equally egregious. In either instance, the prosecutor is standing idly by while the truth, known by the prosecution, is obfuscated or ignored. I find it impossible to reconcile such a perversion of justice with any civilized conception of fairness and due process.

Nor can the result of Stumpf's state-court proceedings be justified by empty obeisance to the state courts' determinations regarding the weight given to Eastman's testimony *during Wesley's trial*. As discussed previously, it is not surprising in the least that Wesley's jury chose not to credit Eastman's testimony regarding Wesley's role in the murder of Mary Jane Stout. After all, the jurors were informed during that trial that Stumpf had previously pleaded guilty to the murder and that a panel of three judges had already determined that Stumpf should be sentenced to death, presumably as the principal offender.

In any event, the consideration given to the weight of Eastman's testimony *against Wesley (not Stumpf)* ultimately is irrelevant to a determination of the legitimacy of *the process* by which Stumpf's sentence was ratified – by state-court judges, the district court in this habeas litigation, and this court on appeal. No concept of fair play or justice with which I am familiar would countenance the blatant gamesmanship now

condoned by the majority. Simply to describe – once again – the actions taken by the prosecution throughout the proceedings against Stumpf is to demonstrate their manifest unfairness. At Stumpf's original sentencing hearing, the State of Ohio, without the benefit of any eyewitness testimony proving that Stumpf was the triggerman, argued forcefully that Stumpf should be put to death because he fired the fatal shots that killed Mary Jane Stout. Later, having been informed that Wesley confessed to Eastman that it was indeed Wesley who took the victim's life, the prosecutor vouched for the truth of Eastman's account and argued that Wesley should be executed as the triggerman as well. The fact that Wesley's jury rejected the state's theory did not deter the prosecution, however. Rather, despite having lately become convinced that Wesley fired the fatal shots and, indeed, having claimed so in a court of law, the prosecutor refused to stand by that position when faced with the possibility that Stumpf would then be removed from death row. Instead, the prosecutor deliberately  failed to clear the mistaken impression that two of the three original sentencing judges held regarding Stumpf's culpability.

The inherent and fundamental unfairness of such overt duplicity was recognized in a dissent from the Supreme Court's decision to deny a stay of execution and a writ of certiorari in *Jacobs v. Scott*, 513 U.S. 1067, 115 S.Ct. 711, 712 (1995). Writing separately, and joined by Justice Ginsburg, Justice Stevens claimed forcefully:

> [F]or a sovereign State represented by the same lawyer to take flatly inconsistent positions in two different cases – and to insist on the imposition of the death penalty after repudiating the factual basis for that sentence – surely raises a serious question of prosecutorial misconduct. In my opinion, it would be fundamentally unfair to execute a person on the basis of a factual determination that the State has formally disavowed.

Clearly, the conduct of the State of Ohio in this matter is eerily similar. What made the state's conduct in the present case even more egregious and more fundamentally unfair than what occurred in *Jacobs*, however, was the juxtaposition of the State of Ohio's refusal to adhere to the position it advanced during Wesley's trial and the statement by Stumpf's sentencing panel that "had [it] not been satisfied that Stumpf

was, in fact, the trigger man . . . that may very well have had an effect upon this Court's determination of whether the death penalty should follow." I concur fully in Justice Stevens's statement of principle in his *Jacobs* dissent and cannot help but find the prosecution's actions in Stumpf's proceedings antithetical to every concept of justice and due process that we have sworn to uphold.

We have adhered, at least for the past 40 years, to the legal and moral principle that death as the ultimate punishment should "not be imposed under sentencing procedures that create[ ] a substantial risk that it would be inflicted in an arbitrary and capricious manner." *Gregg*, 428 U.S. at 188. There is yet another reason why the situation in this appeal epitomizes the arbitrariness that offends the very idea of due process: Stumpf's death sentence was a direct result of the order in which the two individuals, Stumpf and Wesley, were apprehended and brought to trial by the state. Without question, had Wesley been tried before Stumpf, instead of the other way around, Eastman's testimony regarding the principal role played by Wesley would have resulted in Wesley receiving a jury-imposed sentence of death. Moreover, a subsequent trial of Stumpf would have included testimony that *Wesley* was the triggerman in the criminal spree and, possibly, information about capital punishment imposed upon Wesley, thus greatly reducing any chance that Stumpf would also have been sentenced to death. Indeed, under Ohio law, not being the principal offender is a "powerful mitigating factor," such that "[v]ery few death sentences have been approved against persons who were not the principal offender." *State v. Green*, 738 N.E.2d 1208, 1224 (Ohio 2000) (citation omitted).

Similarly, had Stumpf and Wesley been tried together, Eastman's testimony downplaying Stumpf's role in Mary Jane Stout's murder would have been placed before the jury. That evidence, in conjunction with each co-defendant's denial of his principal role in the offense again would have made it unlikely that any rational trier of fact could have concluded that Stumpf should have been sentenced to death.

Since *Gregg*, the United States Supreme Court, as well as federal courts of appeal, have struggled to ensure that any death sentence is imposed not for arbitrary

reasons but, rather, only after measured deliberations and consideration of relevant factors that help identify those persons most responsible for the most depraved crimes against human nature and against society and its norms, "the worst of the worst." It is abundantly clear to me that John David Stumpf was sentenced to be executed by the State of Ohio because he was apprehended before his co-defendant and, thus, was tried before Wesley. Because I am convinced that the same result would not have inured if Wesley had been the first of the two men to be tried, or if the two men had been tried together, it is obvious that the sentence of death in this case was not based upon any compelling evidence or objective criterion. It escapes me why the majority here is apparently blind to the fact that imposition of the death penalty based on such happenstance is the antithesis of fairness and due process. Indeed, in my mind, it is the very definition of arbitrariness and caprice.

As citizens of the last industrialized Western nation to maintain capital punishment,[3] we recognize that decisions concerning the death penalty must be left, for the most part, to our state and national legislative bodies. What then is left to the judiciary is the solemn responsibility to ensure fairness in the imposition of a penalty so drastic that, once carried out, cannot be undone. I had hoped that my colleagues on this court would be able to see through the sleight of hand by which the State of Ohio has attempted to justify the violation of due process that resulted in the arbitrary punishment imposed in this case. Unfortunately for all concerned, but especially for John David Stumpf, they have not. I therefore DISSENT from the majority's decision upholding the death penalty in this case.

---

[3]According to Amnesty International's March 2012 report on *Death Sentences and Executions in 2011*, the United States joined the select fraternity composed of only the following governing bodies when it purposefully executed some of its own citizens during calendar year 2011: Afghanistan, Bangladesh, Belarus, China, Egypt, Iran, Iraq, Malaysia, North Korea, the Palestinian Authority, Saudi Arabia, Somalia, South Sudan, Sudan, Syria, Taiwan, the United Arab Emirates, Viet Nam, and Yemen. *See* http://www.amnesty.org/en/library/asset/ACT50/001/2012/en/241a8301-05b4-41c0-bfd9-2fe72899cda4/act500012012en.pdf, at 7, last visited March 2, 2013.

———————

## DISSENT

———————

HELENE N. WHITE, Circuit Judge, dissenting. All agree that there was no procedural unfairness in Stumpf's original sentencing proceeding or at Wesley's trial. The majority concludes that the proceedings following Wesley's trial were fundamentally fair as well because, although the prosecutor took inconsistent positions regarding who shot Mrs. Stout, he nevertheless presented all the information to the sentencing court and the court made its decision based on a complete evidentiary record that included Wesley's and Eastman's testimony. I agree that the two judges effectively engaged in a resentencing by re-evaluating all the evidence. I conclude, nevertheless, that the proceedings on Stumpf's motion for resentencing violated due process because the complete evidentiary record that might have made the proceedings fundamentally fair was presented to a two-judge, rather than the required three-judge, panel.[1] The Ohio Supreme Court concluded that the matter could be decided by a two-judge panel by characterizing the motion as presenting a question of law, not involving guilt or innocence.[2] *State v. Stumpf*, 512 N.E.2d 598, 609 (Ohio 1987). This characterization of the proceedings as simply a motion to decide whether the new evidence warranted a new sentencing trial, which motion was denied, undermines the premise of the majority opinion—that a complete evidentiary record was presented to the factfinder—and leads to the dissent's ultimate conclusion that Stumpf was denied due process because fundamental fairness requires that evidence that one defendant was the triggerman, which is regarded by the state as sufficiently reliable to support the death penalty for that defendant, must be presented to the body determining the degree of participation of a co-defendant and whether the death penalty is appropriate for the co-defendant.

———————

[1] I acknowledge that this issue was not briefed in the present appeal. However, the two-judge panel's authority was questioned throughout the direct appeal. As the Supreme Court has often noted, "death is different." *See, e.g.*, *Gregg v. Georgia*, 428 U.S. 153, 188 (1976). Counsel's failure to continue to raise a meritorious issue cannot justify ignoring it in a death penalty case.

[2] Stumpf's motion sought leave to withdraw his guilty plea, or alternatively, an order setting aside his death sentence and ordering a new sentencing hearing. (J.A. at 372.) There was no basis to withdraw his plea. At issue is the motion for resentencing.

I.

Ohio's death-penalty scheme provides "[i]f the trial jury unanimously finds, by proof beyond a reasonable doubt, that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors, the trial jury shall recommend to the court that the sentence of death be imposed on the offender," Ohio Rev. Code § 2929.03(D)(2), and that

> if, after receiving . . . the trial jury's recommendation that the sentence of death be imposed, the court finds, by proof beyond a reasonable doubt, or if the panel of three judges unanimously finds, by proof beyond a reasonable doubt, that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors, it shall impose sentence of death on the offender.

*Id.* at (D)(3). Thus, where, as here, the death penalty question is not put to a jury, the decision that the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt must be made unanimously by a panel of three judges.

For all the reasons discussed in the dissent, had the death penalty in this case been imposed by a jury, the prosecutor could not have constitutionally argued that Eastman's testimony at Wesley's trial was not new evidence of sufficient import and reliability to warrant a new sentencing trial. That, indeed, would have been prosecutorial gamesmanship in violation of due process because it would have been clearly dishonest and disingenuous for the prosecution to take the position that Eastman's testimony was so unworthy of belief that it would have no impact on the hypothetical sentencing jury's determination whether Stumpf or Wesley shot Mrs. Stout. And, the issue who was the triggerman is undeniably relevant to the death penalty decision given that one statutory consideration for imposition of the death penalty is the "degree of the offender's participation in the acts that led to the victim's death." Ohio Rev. Code § 2929.04(B)(6).[3]

---

[3]This consideration is not controlling on its own. A jury or three-judge panel could conclude that the other factors are such that an offender who did not fire the fatal shot still deserves the death penalty. *See* Ohio Rev. Code § 2929.04(C)

The prosecutor did not initially take the position that the penalty-phase trier of fact need not consider Eastman's testimony. Rather, the prosecutor argued that Stumpf was subject to the death penalty without regard to whether he pulled the trigger; that mercy for Wesley did not dictate mercy for Stumpf; and that

> [t]he court is not required to accept Eastman's statement that Wesley admitted being the one who actually fired the gun which killed Mrs. Stout. Even so, as noted above, that finding is unnecessary to imposition of the death penalty. Moreover, the three judge panel which made up the court in this case remains available to determine whether the death penalty would have been imposed even if defendant Stumpf were found not to have actually pulled the trigger . . . Only if the court determines that Eastman's testimony might warrant a different sentence, would a further hearing to take Eastman's testimony be necessary. Even deleting the finding that Stumpf was the pri[n]cipal offender and actually shot Mrs. Stout, the remaining findings of the court amply support the determination that the aggravating circumstances outweigh the mitigating factors.

(J.A. at 376.)[4] The crux of the prosecutor's argument in its brief was that the three-judge panel did not have to believe Eastman, but even if it did, Stumpf still deserved the death penalty; and that the court did not have to hear any live testimony unless it "determine[d] that Eastman's testimony might warrant a different sentence." (J.A. at 376.) At the hearing, when it came to light that the third judge had died, the prosecutor took the position that the two remaining judges could determine "whether or not Eastman's testimony is of sufficient credibility to warrant further consideration . . . . whether or not a new trial is warranted on the basis of that evidence." (J.A. at 2604.)

To the extent the prosecutor's argument left it to the three-judge panel to look at all the evidence and decide whether and to what extent Eastman's testimony affected its decision to impose the death penalty, the prosecutor's conduct was not improper. To the extent the prosecutor dismissed Eastman's testimony as insufficient to warrant reconsideration of the death-penalty decision, without regard to the outcome of that

---

[4]The prosecution should have confined itself to the argument that it did not matter who pulled the trigger and honestly admitted that, given the testimony it presented at Wesley's trial, it could not be certain who shot Mrs. Stout.

reconsideration, it violated due process and fundamental fairness because the prosecutor had previously taken the position that the testimony was sufficient to support the death penalty for Wesley.

The majority implicitly regards both the prosecutor's argument and the two-judge panel's conduct as advocating and following the first course. At the hearing on Stumpf's motion, Judge Bettis expressed the view that the testimony might make a difference, and he therefore needed to read the transcripts of Eastman's and Wesley's testimony to see if the testimony changed his mind. The majority finds it significant that Judge Bettis was able to read the transcripts and that Judge Henderson heard Wesley's and Eastman's testimony live at the time it was given. Indeed, this, along with the fact that two appellate panels also concluded the death penalty was appropriate, provides the core support for the majority's decision.[5]

There is, however, a fundamental flaw in this reasoning and in the proceedings following Wesley's trial. The asserted fairness of the proceedings rests on the premise that the legal body that sentenced Stumpf to death pursuant to the Ohio statute considered the evidence that came to light at Wesley's trial, together with all the other evidence, and nevertheless concluded that the death penalty was an appropriate sentence for Stumpf. But this premise is incorrect. Only two of the judges who initially imposed the death penalty reevaluated that decision in light of the evidence at Wesley's trial; the other judge had died. This, in my view, undermines the warden's and the majority's position. It cannot fairly be contended, as the majority asserts throughout its opinion,

---

[5]The majority states:

> [T]he prosecution presented all of the evidence that it had. The factfinders then had—and took—the opportunity to consider the entire record. First, was Stumpf's original sentencing panel. There [one judge said] . . . "I'm gong to read both Eastman and Wesley['s testimony] . . ." The other judge on the panel had presided at Wesley's trial and thus heard Eastman's testimony live. After considering Eastman's testimony, Wesley's testimony, and the evidence that it had already heard, the panel declined to revisit its earlier determination that the death penalty was appropriate. . . . A criminal defendant has the right to a fair proceeding in front of an impartial factfinder based on reliable evidence. He does not have the right to prevent a prosecutor from arguing a justifiable inference from a complete evidentiary record, even if the prosecutor has argued for a different inference from the then-complete evidentiary record in another case.

(Majority Op. at 16–17.)

that all the evidence was presented to the impartial factfinder for a decision on the entire record, because under the Ohio death penalty scheme the factfinder is a jury or a panel of three judges, and the factfinder must unanimously find that the aggravating circumstances outweigh the mitigating factors; the unanimous decision of two judges is insufficient.

Had Stumpf been sentenced to death by a jury and upon attempting to reconvene the jury it was discovered that one of the jurors had died in the interim, it seems clear that the juror would have to be replaced, because under Ohio law, in the absence of a request to the contrary, the defendant has a right to have a unanimous decision of twelve jurors.[6] What occurred here is no different; Stumpf was entitled to a new penalty determination that was based on the entire record including Eastman's testimony; and he was entitled to a sentence other than death unless a jury or a panel of three judges unanimously agreed on that complete record that the aggravating circumstances outweighed the mitigating factors beyond a reasonable doubt. Further, the independent review afforded by the appellate courts cannot save the two-judge panel's decision any more than it could save a non-unanimous recommendation of a jury recommending death by an eleven-to-one vote.

## II.

The Ohio Supreme Court rejected Stumpf's argument on direct appeal that it was error for the two-judge panel to consider his motion for sentencing:

> The [two-judge] panel, upon consideration of appellant's motion, apparently determined that Eastman's testimony added insufficient mitigating weight to affect its balancing of the mitigating factors against the aggravating circumstance. . . . We find no error in that

---

[6] Ohio Rev. Code §§ 2938.06 ("If the number of jurors to be sworn in a case is not stated in the claim, the number to be sworn shall be twelve, but the accused may stipulate for a jury of six"); 2929.03(D)(2) ("If the trial jury unanimously finds, by proof beyond a reasonable doubt, that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors, the trial jury shall recommend to the court that the sentence of death be imposed on the offender."); 2945.29 (providing procedure for replacing a juror with an alternate juror, and requiring that in the absence of an alternate, the court may either swear a new juror and begin the trial anew, or discharge the current jury and impanel a new jury); Ohio Crim. R. 24(G) (providing process for seating alternate jurors in capital cases).

determination.  Eastman's testimony is hearsay and, in the face of the evidence adduced at appellant's sentencing hearing, of minimal weight. As such, it is too attenuated to warrant a vacation of appellant's sentence and a new sentencing hearing.  We therefore find that the panel did not abuse its discretion in denying appellant's motion.

. . .

[Stumpf] maintains that it was error for only two judges to consider his post-sentence motions, inasmuch as R. C. 2945.06 requires a three-judge panel.  . . .   R.C. 2945.06 expressly provides that "[t]he judges *or a majority of them* may decide all questions of fact and law arising upon the trial ***." (Emphasis added.)  Unanimity is mandated only when the panel finds a defendant guilty or not guilty.  Whether appellant was entitled to . . . a new sentencing hearing [was a] question of law, properly determined by a majority of the panel.

*Stumpf*, 512 N.E.2d at 609.

First,  Ohio Rev. Code § 2945.06 also provides that the court "shall follow the procedures contained in sections 2929.03 and 2929.04 of the Revised Code in all cases in which the accused is charged with an offense punishable by death," which includes the unanimity provision for finding that the aggravating circumstances outweigh the mitigating factors.  Second, the Ohio Supreme Court accurately used the qualifier "apparently" because we have no idea on what basis the two-judge panel denied the motion.  The court simply stated:

> Motion of Defendant filed June 7, 1985 was heard before Judge Henderson and Judge Bettis on October 1, 1985.  Defendant's Exhibits 1, 2, and 3 were offered in evidence.  Plaintiff stated that it had no objection to No. 1 and no objection to No. 2 and No. 3 as being transcripts of Eastman and Wesley.  Counsel for Defendant and State of Ohio made statements on record.  The Court took the matter under advisement and after having considered the same, does overrule the Motion to Withdraw Former Plea and the Alternative Motion to Set Aside the Sentence Imposed.

(J.A. at 379.)  Third, the Ohio Supreme Court then imputes conclusions to the two-judge panel that are conjectural, both that the panel found the evidence added insufficient mitigating weight to affect its balancing of the mitigating factors against the aggravating circumstance, and that Eastman's testimony is hearsay and "too attenuated to warrant

a vacation of appellant's sentence and a new sentencing hearing." The former decision had to be made by a three-judge panel. We do not know whether the two-judge panel concluded that its earlier finding that Stumpf was the triggerman continued to be sound despite the new testimony, or that even if Stumpf was not the triggerman, that mitigating fact did not outweigh the aggravating circumstances. But, either way, a three-judge panel was required to make one of those determinations unanimously, beyond a reasonable doubt. If the latter characterization is correct and the two-judge panel simply found the testimony so attenuated that it was unworthy of serious consideration and did not warrant resentencing, the potential import of the testimony should have been conceded by the prosecutor with the actual import being left to the trier of fact.

In sum, notwithstanding the Ohio Supreme Court's characterizations of the motion for new sentencing as a question of law and the two-judge panel's decision as a determination that the evidence was insufficient to warrant a new sentencing hearing, the two-judge panel seemed to recognize that given the relevance of the testimony to the mandatory statutory consideration of the extent of the offender's participation, it was obliged to reconsider the propriety of the death sentence in light of Eastman's and Wesley's testimony, did reconsider the death penalty based on the entire record, and came to the conclusion that the evidence did not change its sentence. This reconsideration was appropriate but could not properly be conducted by a two-judge panel. Alternatively, if the two-judge panel accepted the prosecutor's secondary argument that Eastman's testimony was insufficient to warrant reconsideration of the death-penalty decision, without regard to the outcome of that reconsideration, Stumpf was denied due process and fundamental fairness because the prosecutor had previously taken the position that the testimony was sufficiently reliable to support the death penalty for Wesley.

I dissent from the majority decision upholding the death penalty and would grant the writ subject to Ohio providing Stumpf a new sentencing hearing.